United States District Court
Southern District of Texas
**ENTERED**
August 11, 2021
Nathan Ochsner, Clerk

## IN THE UNITED STATES DISTRICT COURTFOR THE SOUTHERN DISTRICT OF TEXASHOUSTON DIVISION

| | | |
|---|---|---|
| **ABEL LIGUEZ,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. 4:20-CV-02798** |
| | § | |
| **KILOLO KIJAKAZI[1],** | § | |
| **COMMISSIONER OF THE SOCIAL** | § | |
| **SECURITY ADMINISTRATION,** | § | |
| | § | |
| **Defendant.** | § | |

## MEMORANDUM AND RECOMMENDATION

Before the Magistrate Judge in this social security appeal is Plaintiff's Motion for Summary Judgment and Brief in Support (Document No. 16), and Defendant's Cross-Motion for Summary Judgment (Document No. 17), and Brief in Support (Document No. 18). Having considered the cross motions for summary judgment[2], the administrative record, and the applicable law, the Magistrate Judge RECOMMENDS, for the reasons set forth below, that Defendant's Motion for Summary Judgment be GRANTED, Plaintiff's Motion for Summary Judgment be DENIED, and that the decision of the Commissioner be AFFIRMED.

### I.    Introduction

Plaintiff, Abel Liguez ("Liguez") brings this action pursuant to the Social Security Act ("Act"), 42 U.S.C. 405(g), seeking judicial review of a final decision of the Commissioner of Social Security Administration ("Commissioner") denying his application for Supplemental

---

[1] On July 9, 2021, Kilo Kijakazi became the Acting Commissioner of the Social Security Administration.

[2] Plaintiff has moved to strike Defendant's cross-motion for summary judgment as being untimely filed. (Document No. 22). Defendant has responded and argues that its response was filed within the deadlines set by the courts order on February 19, 2021, Order. (Document No. 23). The Magistrate Judge agrees.

Security Income ("SSI"). Liguez alleges that substantial evidence does not support the Administrative Law Judge's ("ALJ") decision, and that the ALJ, Michelle Whetsel, committed errors of law when she found that Liguez was not disabled. Liguez seeks an order reversing the ALJ's decision and awarding benefits. The Commissioner responds that there is substantial evidence in the record to support the ALJ's decision that Liguez was not disabled, that the decision comports with applicable law, and that the decision should, therefore, be affirmed.

## II.    Procedural History

Liguez applied for SSI on November 7, 2018, claiming disability due to pain in his lower and upper back and neck, spinal stenosis, herniated disc, and obstructive sleep apnea. (Tr. 15, 99, 207-13). The Social Security Administration denied his application at the initial and reconsideration stages. (Tr. 122-160). Liguez then requested a hearing before an ALJ on May 21, 2019. (Tr. 141-143). The Social Security Administration granted his request, and the ALJ held a hearing on January 22, 2020. (Tr. 122-160). On January 31, 2020, the ALJ issued her decision finding Liguez not disabled. (Tr. 122-160).

Liguez sought review by the Appeals Council of the ALJ's adverse decision. (Tr. 197-199). The Appeals Council will grant a request to review an ALJ's decision if any of the following circumstances are present: (1) it appears that the ALJ abused her discretion; (2) the ALJ made an error of law in reaching her conclusion; (3) substantial evidence does not support the ALJ's actions, findings, or conclusions; (4) a broad policy issue may affect the public interest or (5) there is new and material evidence and the decision is contrary to the weight of all the record evidence. After considering Liguez's contentions in light of the applicable regulations and evidence, the Appeals Council, on July 17, 2020, concluded that there was no basis upon which to grant Liguez's request for review.  (Tr. 1-5). The ALJ's findings and decision thus became final.

1

Liguez has timely filed his appeal of the ALJ's decision (Document No. 1).  The parties have filed Cross-Motions for Summary Judgment and responses thereto. The evidence is set forth in the transcript, pages 1 through 710. There is no dispute as to the facts contained therein.

## III.    Judicial Review

The Court, in its review of a denial of disability benefits, is only "to [determine] (1) whether substantial evidence supports the Commissioner's decision, and (2) whether the Commissioner's decision comports with relevant legal standards." *Jones v. Apfel*, 174 F.3d 692, 693 (5th Cir. 1999). Indeed, Title 42, Section 405(g) limits judicial review of the Commissioner's decision as follows: "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). The Act specifically grants the district court the power to enter judgment, upon the pleadings, and transcript, "affirming, modifying, or reversing the decision of the Commissioner of Social Security with or without remanding the case for a rehearing" when not supported by substantial evidence. *Id.* While it is incumbent upon the court to examine the record in its entirety to decide whether the decision is supportable, *Simmons v. Harris*, 602 F.2d 1233, 1236 (5th Cir. 1979), the court may not "reweigh the evidence in the record nor try the issues de novo, nor substitute its judgment" for that of the Commissioner even if the evidence preponderates against the Commissioner's decision. *Chaparo v. Bowen*, 815 F.2d 1008, 1009 (5th Cir. 1987); *see also Jones* at 693; *Cook v. Heckler*, 750 F.2d 391, 392 (5th Cir. 1985). Conflicts in the evidence are for the Commissioner to resolve. *Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir. 1992).

The United States Supreme Court has defined "substantial evidence," as used in the Act, to be "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co.*

*v. N.L.R.B.,* 305 U.S. 197, 229 (1938)). Substantial evidence is "more than a scintilla and less than a preponderance." *Spellman v. Shalala,* 1 F.3d 357, 360 (5th Cir. 1993). The evidence must create more than "a suspicion of the existence of the fact to be established, but no 'substantial evidence' will be found only where there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'" *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983) (quoting *Hemphill v. Weinberger*, 483 F.2d 1127 (5th Cir. 1973)).

### IV.     Burden of Proof for Entitlement to Social Security Benefits

An individual claiming entitlement to disability insurance benefits under the Act has the burden of proving his disability. *Johnson v. Bowen*, 864 F.2d 340, 344 (5th Cir. 1988). The Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). The impairment must be proven through medically accepted clinical and laboratory diagnostic techniques. *Id.* § 423(d)(3). The impairment must be so severe as to limit the claimant in the following manner:

> he is not only unable to do [his] previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

*Id.* § 423(d)(2)(A). The mere presence of an impairment is not enough to establish that one is suffering from a disability. Rather, a claimant is disabled only if he is "incapable of engaging in any substantial gainful activity." *Anthony v. Sullivan*, 954 F.2d 289, 293 (5th Cir. 1992) (quoting *Milan v. Bowen*, 782 F.2d 1284 (5th Cir. 1986)).

### V.     Administrative Proceedings

The Commissioner applies a five-step sequential process to determine disability status:

1.  If the claimant is presently working, a finding of "not disabled" must be made;

2.  If the claimant does not have a "severe" impairment or combination of impairments, he will not be found disabled;

3.  If the claimant has an impairment that meets or equals an impairment listed in Appendix 1 of the Regulations, disability is presumed and benefits are awarded;

4.  If the claimant is capable of performing past relevant work, a finding of "not disabled" must be made; and

5.  If the claimant's impairment prevents him from doing any other substantial gainful activity, taking into consideration his age, education, past work experience, and residual functional capacity, he will be found disabled.

*Id.*, 954 F.2d at 293; *see also Leggett v. Chater*, 67 F.3d 558, 563 n.2 (5th Cir. 1995); *Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991). Under this formula, the claimant bears the burden of proof on the first four steps of the analysis to establish that a disability exists. If successful, the burden shifts to the Commissioner, at step five, to show that the claimant can perform other work. *McQueen v. Apfel*, 168 F.3d 152, 154 (5th Cir. 1999). This burden may be satisfied either by reference to the Medical–Vocational Guidelines of the regulations or by expert vocational testimony or other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). Once the Commissioner demonstrates that other jobs are available, the burden shifts, again, to the claimant to rebut this finding. *Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990). If, at any step in the process, the Commissioner determines that the claimant is or is not disabled, the evaluation ends. *Leggett*, 67 F.3d at 563.

In the instant action, the ALJ determined, in her January 31, 2020, decision that Liguez was not disabled at step five. In particular, the ALJ determined that Liguez had not engaged in substantial gainful activity since November 7, 2018, the alleged onset date (step one); that Liguez's

obesity, spinal stenosis, cervical spondylosis, sleep apnea, hypertension, left shoulder derangement, and left knee derangement were severe impairments; (step two); that Liguez does not have an impairment or combination of impairments that meet or medically equal one of the listed impairments in Appendix 1 of the regulations (step three); that Liguez has the RFC to perform light work with the following limitations:

> He can stand and walk for four hours and sit for about six hours in an eight-hour workday. He can occasionally climb ramps and stairs, but should never climb ladders, ropes, or scaffolds. He can occasionally balance, stoop, kneel, crouch, and crawl. He should avoid concentrated exposure to extreme heat, extreme cold, fumes, dusts, odors, gases, poor ventilation, dangerous moving machinery, unprotected heights, and wet, slippery, or uneven surfaces. He can frequently reach in all directions, including overhead, bilaterally. He can occasionally push, pull and operate foot controls bilaterally. He can frequently turn his head 90 degrees or more to the left, to the right, raise it up, and/or move it down.  (Tr. 18).

Based on Liguez's RFC, the ALJ found Liguez is unable to perform past relevant work as a warehouse worker (step four). Because Liguez could not perform any past relevant work, the analysis proceeded to (step five) to determine whether Liguez could perform any other work considering his RFC, age (51), education (high school), and work experience. Based on Liguez's RFC and the testimony of a Vocational Expert, the ALJ determined that Liguez was not disabled because there are jobs that exist in significant numbers in the national economy that he can perform. The ALJ's decision became the Commissioner's final decision when the Appeal Council denied Liguez's request for review on July 17, 2020. (Tr. 1-5).

Accordingly, the Court must determine whether substantial evidence supports the ALJ's step five finding. In determining whether substantial evidence supports the ALJ's decision, the court weighs four factors: (1) the objective medical facts; (2) the diagnosis and expert opinions of treating, examining and consultative physicians on subsidiary questions of fact; (3) subjective

evidence as testified to by the plaintiff and corroborated by family and neighbors; and (4) the plaintiff's educational background, work history, and present age. *Wren*, 925 F.2d at 126.

## VI.   Discussion

Liguez raises three issues on appeal. First, that the ALJ failed to consider all of Liguez's functional limitations in determining his RFC. Second, that the ALJ improperly substituted her own medical judgment to determine Liguez's RFC. Third, that the ALJ failed to establish the existence of alternative work which Liguez can perform. The Commissioner responds that there is substantial evidence in the record to support the ALJ's determination and the decision that Liguez was not disabled, and that the decision comports with applicable law.

### A. Objective Medical Evidence

The objective medical evidence shows that Liguez suffers from obesity, spinal stenosis, cervical spondylosis, sleep apnea, hypertension, left shoulder derangement, and left knee derangement. By way of background information, records show that Liguez stopped working after he was involved in a motor vehicle accident on June 1, 2016. He was hit on the passenger's side and pushed into a pole. (Tr. 508-533). At that time, Liguez was taken to Memorial Hermann Greater Heights where he was treated for injuries to the neck, upper back and left knee. (Tr. 508-533). At that time, Liguez weighed 328 pounds and had a body mass index score ("BMI") of 45.85. (Tr. 436). To treat his injuries, Liguez completed 31 physical therapy sessions over a 15-to-16-week period and received caudal epidural steroid injections at the L4-L5 level. (Tr. 344-428, 491).

In 2018, Liguez started seeing Dr. Fields at Harris Healthcare every three months. Liguez weighed 369 pounds and had a BMI of 50.0-59.9 at his first visit on August 1, 2018. (Tr. 576). Based on her examination, Dr. Fields diagnosed back pain, obstructive sleep apnea ("OSA") symptoms, and obesity.  Liguez was prescribed Gabapentin and Naproxen for back pain, referred

for a sleep study for OSA symptoms, and to a urologist for urinary frequency.  Dr. Fields also discussed diet and exercise. (Tr. 691). Liguez had a follow-up appointment on October 24, 2018. He weighed weighed 403 pounds. (Tr. 674). Dr. Fields increased Liguez's Gabapentin prescription to 400 mg. (Tr. 685). Liguez's sleep study results were reviewed, and he was prescribed a CPAP device. (Tr. 685). At his third visit on March 20, 2019, Liguez weighed 420 pounds and had a BMI of 58.58. (Tr. 654). Because of complaints of pain, Dr. Fields increased the Gabapentin to 600 mg, prescribed albuterol, benzonatate (seasonal allergies), cetirizine (seasonal allergies), fluticasone, hydrochlorothiazide, ibuprofen, and continued the lisinopril and naproxen. (Tr. 655). Liguez requested a cane for ambulation. (Tr. 654).

On July 18, 2019, Liguez saw Dr. Fields about his urinary frequency. Liguez weighed 415 pounds and had a BMI of 57.88. (Tr. 634). A urinalysis and urine culture were ordered and Liguez was referred to a urologist for additional testing. (Tr. 637). There are no records that Liguez follow-up with a urologist. (Tr. 641). In addition, Dr. Fields performed a prostate cancer screening and noted a benign prostatic hyperplasia with lower urinary tract symptoms as unspecified. (Tr. 635). His medications stayed the same except Dr. Fields added Proventil and tamsulosin and discontinued albuterol and benzonatate. (Tr. 647).

On October 30, 2019, Liguez's primary complaint was lumbar spine pain. (Tr. 611). Liguez weighed 410 pounds and had a BMI of 57.18. (Tr. 613). The progress note states that he is a 52-year-old man that ambulates with a cane. (Tr. 613). Because of complaints of pain, Dr. Fields increased the dosage of Gabapentin to 800 mg. Dr. Fields also added oxybutynin for urinary frequency, and discontinued tamsulosin. (Tr. 621-623). On December 5, 2019, Liguez weighed 397 pounds and had a BMI of 55.38. (Tr. 595). The treatment note reflects that Liguez complained

of back pain. (Tr. 593). Dr. Fields prescribed acetaminophen-codeine, renewed his other prescriptions, and gave him the influenza vaccination. (Tr. 607).

Because Liguez had applied for benefits, he was referred to Dr. Daryl K. Daniel ("Dr. Daniel") for an evaluation on February 15, 2019. (Tr. 535-537). At the time of the examination, Liguez weighed 358 pounds. *Id*. Liguez's chief complaint was "spinal injury," obstructive sleep apnea. (Tr. 535). His current medications were Gabapentin, naproxen and lisinopril. *Id*. An x-ray of the cervical spine revealed, "mild, multilevel cervical spondylosis with otherwise no acute abnormality." (Tr. 539). The physical examination results show:

> General: The history provided is adequate, and claimant is in no obvious distress. Alert and oriented to person, place and time.
>
> HEENT: Normocephalic, atraumatic head. Pupils are reactive to light and accommodation normally and equally. Extraocular movements are intact. Oropharynx is clear without pathology. Teeth, tongue and gums appear normal with moist mucous membranes. Tympanic membranes and nares are normal without evidence of pathology.
>
> Neck: Neck is supple. No JVD, thyromegaly, bruits or lymphadenopathy.
>
> Respiratory: Lungs are clear to auscultation and percussion bilaterally without wheezes, rhonchi, or rales. Full inspiratory and expiratory effort.
>
> Cardiac: Normal PMI with regular rate and rhythm. Normal S1 and S2. No clicks, rubs or gallops. No heaves or thrills.
>
> Abdomen: Abdomen is essentially non-tender, non-distended, soft and without increased organ size. Normal bowel sounds noted.
>
> Back: No evidence of pathological curvatures, spasm or misalignment.
>
> Pulses: Normal distally and bounding without evidence of flow interruption.
>
> Extremities: No cyanosis, clubbing, or edema.
>
> Skin: Normal without obvious rashes or exanthems. Skin turgor is adequate and no plaques or pathological discoloration noted.

Musculoskeletal: No muscle atrophy or bone enlargement noted. No crepitans, bony or tissue destruction, join instability, redness, swilling or effusion.

Neurological: Cranial nerves II through XII, and deep tendon reflexes are grossly normal. Sensory examination is noted to be adequate in the upper extremities and lower extremities. Gait is normal with no problems standing from a sitting position. Hand grip/strength is 5/5 on the left and 5/5 on the right. In the major muscle groups (including shoulders and forearms), upper extremity strength is 5/5 on the left and 5/5 on the right. Lower extremity strength is at 4/5 on the left and 4/5 on the right with knee raises and with leg extensions. Straight leg raises are positive at 60 degrees on the left and 60 on the right, while in the supine position. Claimant can effectively bend over 70 degrees with an attempt to touch toes. Claimant can walk on toes and heels, and is unable to squat today, with noted support of the exam table. (Tr. 536)

Based on the x-rays, and physical examination results, Dr. Daniel diagnosed morbid obesity, chronic back pain, secondary to spinal stenosis and herniated disc, obstructive sleep apnea, and chronic pain. (Tr. 537).

On February 20, 2019, State agency medical consultants, Tina Ward, M.D., and Kim Rowlands, M.D., reviewed the medical records and opined that Liguez had the physical residual functioning capacity to lift, carry, push, and pull 20 pounds occasionally and 10 pounds frequently, stand and/or walk for a total of four hours, and sit for a total of six hours in an eight-hour workday. (Tr. 103-105, 115-117). Additionally, he could occasionally climb ramps and stairs, and never climb ladders, ropes, or scaffolds. He could occasionally balance, stoop, kneel, crouch, and crawl. (Tr. 98-108, 110-120).  The state agency medical consultants further opined that Liguez had no manipulative, visual, communicative or environmental limitations. (Tr. 104-105).

Liguez argues that the ALJ erred at step 2 because she applied an incorrect legal standard to evaluate severe impairment. Specifically, Liguez contends that the ALJ committed a *Stone* error—that is, the ALJ used the wrong standard to assess the severity of Liguez's impairment. *See Stone v. Heckler*, 752 F.2d 1099, 1101 (5th Cir. 1985).

In *Stone*, the Fifth Circuit opined that an "impairment can be considered as not severe only if it is a slight abnormality [having] such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education or work experience." *Id*. at 1101.

Here, even though the ALJ did not mention the *Stone* standard, she did cite Social Security Ruling ("SSR") 85-28, which uses some of the same language as *Stone*, but it is not identical. The Fifth Circuit in *Keel v. Saul*, 986 F.3d 551, 556 (5th Cir. 2021) held that although the precise wording differs between SSR 85-28 and *Stone*, the two standards are not substantially different enough to warrant a finding of error. *Keel*, 986 F.3d at 556.

Based on the objective medical evidence, as thoroughly discussed by the ALJ in her decision, substantial evidence supports the ALJ's determination at steps two and three. This factor weighs in favor of the ALJ's decision.

### B.  Medical Opinions

The second element considered is the diagnosis and expert opinions of treating and examining physicians on subsidiary questions of fact. RFC is an assessment of a claimant's ability to do work on a sustained basis in an ordinary work setting despite his impairments.  20 C.F.R. §§ 404.1545(a), 416.945(a).  It is the most a claimant can do despite his physical and mental impairments.  *Id*.  The RFC has three components:  physical abilities, mental abilities, and other abilities affected by impairments. *Id*.  Simply put:  it reflects the claimant's maximum remaining ability to do sustained work activity in an ordinary work setting on a regular and continuing basis. *See  Myers v. Apfel*, 238 F.3d 617, 620 (5thCir. 2001); SSR 96-8p, 1996 WL 374184, at *2.  It is a function-by-function assessment, with both exertional and non-exertional factors to be considered, and is based upon all of the relevant evidence in the case record.  *Id*. At *3-*5.  The ALJ is permitted

to draw reasonable inferences from the record evidence.   Presumptions, speculation, and supposition do not constitute evidence.  *See, e.g.,* SSR 86-8, 1986 WL 68636, at *8 (1986), superseded by SSR 91-7c, 1991 WL 231791, at *1 (Aug. 1, 1991)(superseded only to the extent the SSR discusses the former procedures used to determine disability in children).  The Regulations set forth how the ALJ must consider medical opinions and prior administrative medical findings for claims filed on or after March 27, 2017.  20 C.F.R. §§404.1520c(a), 416.920c(a).  In determining Liguez's RFC, the ALJ applied the new § 416.920(c(a). The ALJ is no longer required to defer or give any specific evidentiary weight, including controlling weight, to any medical opinion or prior administrative medical finding. *Id.* at § 404.1520c(a)[3]; *Winston v. Berryhill*, 755 Fed. Appx. 395, 402 n. 4 (5th Cir. 2018). Instead of assigning a weight, including controlling weight, the ALJ considers the persuasiveness of each medical opinion or prior administrative finding in the record. Five factors the ALJ considers in evaluating an opinions persuasiveness include (1) supportability; (2) consistency; (3) relationship with the claimant, which includes considering the length of the treatment relationship, the frequency of examinations, the purpose of the treatment relationship, the extent of the treatment relationship, and the examining relationship; (4) specialization; and (5) other factors.   20 C.F.R. § 404.1520c(c)(1)-(5), 416.920c(c)(1)-(5).   Of the five factors, the most important factors are supportability and consistency.  *Id.* at §§404.1520c(b)(2), 416.920(b)(2). Additionally, the ALJ may discuss the persuasiveness of all medical opinions in a single analysis. *Id.* at § 404.1520c(b)(1), 416.920(b)(1). Not all statements  by medical providers are considered medical opinions.  Under the new regulations, "[a] medical opinion is a statement from a medical source about what [the claimant] can still do despite [the claimant's] impairments and whether [the

---

[3] The Social Security Administration recently promulgated a new rule regarding RFC determinations to govern all claims filed on or after March 27, 2017. See 20 C.F.R. § 404.1520c.

claimant has] one or more impairment-related limitations or restrictions," in the claimant's ability to perform the physical or mental demands of work activities, perform other demands of work, and adapt to environmental conditions.   *Id*. at §§404.1513(a)(2), 416.913(a)(2).   Medical signs and laboratory findings are considered "objective medical evidence."   *Id*. at §§ 404.1513(a)(1), 416.913(a)(1).   And any other statements, "including judgments about the nature and severity of [the claimant's] impairments, [the claimant's] medical history, clinical findings, diagnosis, treatment prescribed with response, or prognosis" constitute "other medical evidence."   *Id*. at §§ 404.1513(a)(3), 416.913(a)(3).

"RFC determinations are inherently intertwined with matters of credibility, and the ALJ's credibility determinations are generally entitled to great deference." *Acosta v. Astrue*, 865 F. Supp. 2d 767, 790 (W.D. Tex. 2012) (citing Newton, 209 F.3d at 459 (internal quotation omitted)). The Fifth Circuit has made clear that an ALJ "may not—without opinions from medical experts— derive the applicant's residual functional capacity based solely on the evidence of his or her claimed medical conditions." *Fleming v. Saul*, No. SA-19-CV-00701-ESC, 2020 WL 4601669, at *4 (W.D. Tex. Aug. 10, 2020) (citing *Ripley v. Chater*, 67 F.3d 552, 557– 58 (5th Cir. 1995)). Numerous district courts have relied on this principle in vacating RFC determinations that are not supported by an actual medical opinion and instead are based on the ALJ's subjective interpretation of the medical data in the record. *See, e.g., Raper v. Colvin*, 262 F.Supp. 3d 415, 422–23 (N.D. Tex. 2017) (finding the ALJ's RFC determination to be unsupported by substantial evidence under Ripley); *Fitzpatrick v. Colvin*, No. 3:15-CV-3202-D, 2016 WL 1258477, at *8 (N.D. Tex. Mar. 31, 2016) ("[T]he ALJ improperly made an independent RFC finding after declining to rely on any of the medical opinions addressing the effects of Fitzpatrick's mental impairments on his ability to work."); *Thornhill v. Colvin*, No. 3:14-CV-335-M (BN), 2015 WL

232844, at *10 (N.D. Tex. Jan. 16, 2015) ("While the ALJ may choose to reject medical sources'

opinions, he cannot then independently decide the effects of Plaintiff's mental impairments on her

ability to perform work-related activities, as that is prohibited by Ripley ...."). This is because an

ALJ may not substitute his or her lay opinion for the uncontroverted medical opinions of the only

physicians of record on the effects of the claimant's impairments. *Garcia v. Berryhill*, No. EP-17-

CV-00263-ATB, 2018 WL 1513688, at *2 (W.D. Tex. Mar. 27, 2018). Where "the ALJ rejects

the only medical opinions of record, interprets the raw medical data, and imposes a different RFC,

the ALJ has committed reversible error." *Id.; see also Beachum v. Berryhill*, No. 1:17-cv-00095-

AWA, 2018 WL 4560214, at *4 (W.D. Tex. Sept. 21, 2018) (citing *Garcia*, 2018 WL 1513688, at

*2).

Liguez contends that the ALJ improperly substituted her own medical judgement to

determine his RFC. (Pl's Brief at 4). Specifically, Liguez argues that the ALJ's RFC determination

that he can frequently reach in all directions, including overhead, with both upper extremities, is

not supported by evidence. (Pl's Brief at 12). According to Liguez, there is no medical opinion

evidence of record describing this degree of limitation.  The Commissioner counters that the ALJ

did not make a medical determination but relied upon the state agency physicians' opinions and

medical evidence, and that the RFC determination is supported by substantial evidence.

With respect to the opinions and diagnoses of treating physicians and medical sources, the

ALJ wrote:

> As for medical opinions and prior administrative medical findings, I do not defer
> or give any specific evidentiary weight, including controlling weight, to any prior
> administrative medical findings or medical opinions, including those from medical
> sources. I have fully considered the medical opinions and prior administrative
> medical findings.

13

> I find that the assessments by the State agency medical consultants, Tina Ward, M.D., and Kim Rowlands, M.D., are persuasive as these sources opined that the claimant could lift, carry, push, and pull 20 pounds occasionally and 10 pounds frequently (Exhibits 1A and 3A). It was also opined that he could stand and/or walk for four hours in an eight-hour workday, and he could sit for about six hours in an eight-hour workday. He could occasionally climb ramps and stairs, and he could not climb ladders, ropes, or scaffolds. It was further opined that he could occasionally balance, stoop, kneel, crouch, and crawl (Exhibits 1A and 3A). These opinions are persuasive because they are consistent with, and supported by, the medical evidence showing that the claimant's musculoskeletal examination findings were within normal limits despite some evidence of a positive straight-leg raising test and lower extremity strength of 4/5 bilaterally (Tr. 22).

Here, the ALJ identified the reasons for the persuasiveness of the medical opinions of Drs. Ward and Rowlands. The ALJ found their respective opinions consistent and supported by the medical evidence as well as Dr. Gibson's consultative examination. The ALJ's evaluation of the medical opinions fully comports with the new social security regulations because the ALJ articulated generally how persuasive she found each opinion. *Id*. at 404.1520c(b), 416.920c(b).

Furthermore, substantial evidence supports the ALJ's RFC determination. This is not a case in which there are no medical opinions of record, and the ALJ independently analyzed the raw medical data without any guidance from medical professionals. *Cf. Ripley*, 67 F.3d at 557 (holding that ALJ had a duty to develop the record where medical opinions were absent). Here, the ALJ considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 416.929 and SSR 16-3p. The ALJ considered Liguez's testimony in which he testified about his health and its impact on his daily activities. Liguez testified that he sustained back and left knee injuries from the motor vehicle accident in June 2016 and stopped working as a result. (Tr. 44-45). He testified that he has problems standing, lifting, bending, and walking for prolonged periods of time because it bothers his injurious areas. (Tr. 47, 55). The ALJ also considered

Liguez's Adult Function Report ("AFR") completed on April 10, 2019. Liguez wrote that his injuries have substantially impacted his daily routine, limiting him from heavy lifting and taking long walks and household work. (Tr. 280-287), However, Liguez testified and wrote in his AFR that he can stand for 30 minutes, walk a block, lift and carry approximately 10 to 20 pounds, engage in housework, prepare meals, drive for about 20 to 25 minutes, mow the yard, and can go grocery shopping while pushing the basket for support. (Tr. 62-66, 72-77). After careful consideration, the ALJ determined that Liguez's symptoms could reasonably be expected as a result of his impairments, but they were ultimately not entirely consistent with the medical evidence in the record. (Tr. 20).

As discussed above, the ALJ considered Liguez's impairments and the medical opinions and prior administrative findings in accordance with the requirements of 20 CFR 416.920c. The ALJ considered Liguez's evaluation with Dr. Daryl Daniel ("Dr. Daniel") which took place on February 15, 2019. (Tr. 535-537). Specifically, the ALJ noted Dr. Daniel's observations of Liguez during the consultative examination. Dr. Daniel observed that Liguez's straight leg raising test was positive bilaterally, lower extremity strength was 4/5 bilaterally, and was unable to squat with noted support of the exam table. However, on examination of Liguez's back, Dr. Daniel observed that there was no evidence of pathological curvatures, spasm, or misalignment, or muscle atrophy. *Id*. He also observed that Liguez's gait was normal, and could stand from a sitting position, effectively bend over 70 degrees with an attempt to touch his toes and could walk on toes and heels. In addition, Dr. Daniel observed that Liguez's hand grip/strength was 5/5 bilaterally, and his upper extremity strength was 5/5 bilaterally. Additionally, the February 2019 x-rays of Liguez's cervical spine showed mild cervical spondylosis with no acute abomormality. (Tr. 539).

The ALJ also considered Liguez's office visits with Dr. Jo Anna Fields-Gilmore ("Dr. Fields"). At these visits, Liguez alleged either back, leg, or lumbar spine pain. At Liguez's March 2019 office visit, Dr. Fields noted that his musculoskeletal examination indicated that he had a normal range of motion. (Tr. 542). At his October 2019 office visit, Dr. Fields-Gilmore noted that his musculoskeletal examination  showed that he had a normal range of motion. (Tr. 614). At his December 2019 office visit, he alleged that he continued to have lumbar spine pain, but Dr. Field's treatment notes show that he had a normal range of motion. (Tr. 595).

With respect to urinary frequency, after careful consideration of the evidence, the ALJ found that Liguez's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [Liguez's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." (Tr. 20).The ALJ pointed to Liguez not following up with a urologist despite a referral.  The ALJ is not required to incorporate limitations in the RFC that she did not find to be supported by the record. *See Muse v. Sullivan*, 925 F.2d 785, 790 (5th Cir. 1991).

Likewise, the ALJ considered Liguez's obesity and left knee derangement. In her decision, the ALJ considered Liguez's obesity and the limiting effects in combination with his other impairments. (Tr. 21). SSR 02-1p recognizes that "[f]or adults, both men and women, the Clinical Guidelines describe...a [body mass index ('BMI')] of 30.0 or above as 'obesity.'" SSR 02-1p, 2002 WL 34686281, at *2.[4] Obesity is a risk factor that increases an individual's chances of developing impairments in most body systems which commonly leads to, and often complicates, chronic

_____

[4] On May 20, 2019, the Social Security Administration published SSR 19-2p, which rescinded and replaced the guidelines for evaluating obesity under SSR 02-1p. Because the Social Security Administration stated that SSR 19-2p applies only to applications filed on or after May 20, 2019, SSR 19-2p lacks retroactive effect and SSR 02-1p applies to Liguez's claims filed in November of 2018. *See Holt v. Saul*, No. 4:19-CV-01894, 2020 WL 2549346, at *3 (S.D. Tex. May 19, 2020).

diseases of the cardiovascular, respiratory, and musculoskeletal body systems. SSR 02-1P (S.S.A. Sept. 12, 2002). The ALJ pointed to the consultative examination which reflected that Liguez weighed 358 pounds, which computed to a BMI of 49.9 as well as the treatment note from his March 2019 appointment with Dr. Fields which indicated a BMI of 58.58. (Tr. 21). To the extent that Liguez contends that he gained 51 pounds between November 2018 and March 2019 and therefore his obesity "is likely to have further adversely affected [his] musculoskeletal and respiratory disorders." (Pl. 's Br. at 9), the ALJ took into consideration the totality of medical records, including those that show the 51 pound weight gain.  The  ALJ's decision clearly shows that Liguez's obesity was considered and there was no medical evidence establishing any obesity-related functional limitations that should have been included in the RFC. As such, Liguez has not been prejudiced. *See Walford v. Astrue*, No. 3-09-CV-0629-BD, 2011 WL 2313012, at *5 (N.D. Tex. June 10, 2011) ("Where an ALJ fails to comply with SSR 02–1p [regarding the evaluation of obesity], courts generally find that the claimant has been prejudiced unless: (1) the ALJ limits the claimant to sedentary work, or (2) the record is totally devoid of medical evidence establishing any obesity-related limitations." (emphasis added)).

Concerning Liguez's left knee derangement, the ALJ considered this formulating Liguez's RFC. Liguez testified that he sits in a recliner with his legs elevated to relieve his symptoms. (Tr. 63-64). However, the ALJ pointed to no physician or consultant examiner instructing him to elevate his leg and he specifically requested a cane.  (Tr. 536-37). As discussed above, the ALJ is not required to incorporate in the RFC limitations not supported in the record. *See* Morris v. Bowen, 864 F.2d 333, 336 (5th Cir. 1988) (per curiam). Accordingly, the ALJ did not commit error by not incorporating in the RFC limitations relating to Liguez's leg.

On February 20, 2019, State agency medical consultants, Tina Ward, M.D., and Kim Rowlands, M.D., reviewed the medical records and opined that the claimant could lift, carry, push, and pull 20 pounds occasionally and 10 pounds frequently. (Tr. 98-108, 110-120). It was also opined that Liguez could stand and/or walk for four hours in an eight-hour workday, and he could sit for about six hours in an eight-hour workday. He could occasionally climb ramps and stairs, and he could not climb ladders, ropes, or scaffolds. It was further opined that he could occasionally balance, stoop, kneel, crouch, and crawl. (Tr. 98-108, 110-120). In addition, it was further found by the State agency medical consultants that he has no postural or manipulative limitations. (Tr. 98-108, 110-120). Based on these determinations, the medical consultants determined that Liguez is limited to light work, capable of standing and walking no more than four hours in an eight-hour workday and sitting about six hours in an eight-hour workday. The state agency consultants opined he had no other functional limitaitons.

In conclusion, the ALJ properly incorporated all the appropriate functional limitations in his RFC to account for Liguez's severe and non-severe impairments. The ALJ, based on the totality of the evidence, concluded that Liguez has the RFC to perform light work as defined in 20 CFR 416.967(b) except he can stand and walk for four hours and sit for about six hours in an eight-hour workday. In addition, the ALJ found he can occasionally climb ramps and stairs, but could never climb ladders, ropes, or scaffolds; occasionally balance, stoop, kneel, crouch, and crawl; avoid concentrated exposure to extreme heat, extreme cold, fumes, dusts, odors, gases, poor ventilation, dangerous moving machinery, unprotected heights, and wet, slippery, or uneven surfaces; could frequently reach in all directions, including overhead, bilaterally; occasionally push, pull and operate foot controls bilaterally; and frequently turn his head 90 degrees or more to the left, to the right, raise it up, and/or move it down. The ALJ discussed the medical opinion(s) and prior

18

administrative medical finding(s) in accordance with the requirements of 20 CFR 416.920c. This is not a case in which the ALJ truly rejected all of the medical opinions of record and fashioned a completely distinctive RFC. *Cf. Williams*, 355 Fed. App'x at 831 (finding reversible error where ALJ discounted opinions of three treating physicians and record contained no evidence supporting ALJ's finding that claimant could stand or walk for six hours in an eight-hour workday). This is not a case in which the ALJ found no medical opinion persuasive and crafted a completely distinctive RFC. The state agency medical consultants assessed the effects of Plaintiff's impairments on his ability to work.  The ALJ found the opinions of the state medical consultants persuasive. While Liguez complains that he cannot reach overhead bilaterally, neither state medical consultants opined that he had *any* reaching limitations, and Dr. Gibson noted that his upper body strength was 5/5 bilaterally in the major muscle groups, and x-rays of the cervical spine revealed mild multilevel spondylosis. The ALJ imposed a more restrictive RFC determination than found by the state agency medical consultants.  The ALJ did not improperly substitute her own medical judgment in determining Liguez's RFC.  The diagnosis and expert opinion factor weights in favor of the ALJ's decision.

### C.  Subjective Medical Evidence

When evaluating a claimant's subjective complaints, the Social Security Regulations set forth a two-step symptom evaluation process. *See* C.F.R. §§ 404.1429, 416.929; SSR 16-3p, 2017 WL 5180304, at *2-3 (S.S.A. Oct. 25, 2017). First, the ALJ considers whether the claimant had a medically determinable impairment that could reasonably be expected to produce the alleged symptoms. *See* 16-3p, 2017 WL 5180304, at *3-4. At step two, the ALJ evaluates the intensity, persistence, and limiting effects of the alleged symptoms to determine the extent to which they limit the claimant's ability to do basic work activities. *See id*. at *4-5. In doing so, the ALJ

19

considers the entire record, including medical signs and laboratory findings, and statements by the claimant and his treating or examining sources concerning the alleged symptoms and their effect. *See id*. at *5-7. Additionally, in evaluating intensity, persistence, and limiting effects of a claimant's symptoms, the ALJ considers a non-exclusive list of seven factors: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of pain or other symptoms; (3) factors that precipitate and aggravate symptoms; (4) the type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms; (5) treatment, other than medication, for relief of pain or other symptoms; (6) measures other than treatment the claimant uses to relieve pain or other symptoms (e.g., lying flat on his or her back); (7) and any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms. Id. at 7-8; see also 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). Although the ALJ may not reject a claimant's subjective symptoms solely because those symptoms do not align with the objective medical evidence, the ALJ, nonetheless, may consider those symptoms in accordance with the objective medical evidence. Guillory v. Saul, No. 1:19-CV-632, 2021 WL 1600283, at *12 (E.D. Tex. Apr. 23, 2021). Subjective evidence does not take precedence over objective evidence. An ALJ may discount a claimant's subjective symptoms due to contradictory or inconsistence evidence in the record. *Byrd v. Asture*, No. CIV. 1:07-CV-0111-C, 2008 WL 4414581, at *14 (N.D. Tex. Sept. 30, 2008). SSR 16-3P makes clear that the credibility analysis is focused on the regulatory language and is not an examination of the claimant's character. *Id*. at *1. "The Ruling leaves the ultimate credibility determination to the ALJ's discretion." *Rodriguez v. Berryhill*, No. CV H-17-3102, 2019 WL 403860, at *11 (S.D.Tex. Jan 3, 2019), report and recommendation adopted, No. CV H-17-31-2, 2-19 WL 398181 (S.D. Tex. Jan. 29, 2019). The ALJ must set forth specific reasons supporting the credibility determination. SSR 16-3P 2017 WL 5180304, at *10;

20

*Falco v. Shalala*, 27 F.3d 160, 164 (5th Cir. 1994); *Pearce v. Saul*, No. CV SA-18-CA-1131-XR, 2020 WL 290017, at *15 (W.D. Tex. Jan. 21, 2020)(holding that the ALJ does not need to specifically address why he was rejecting the plaintiff's testimony because his analysis can be determined by his narrative recounting of Plaintiff's activities, medical evaluations, and the fact that past treatment had proved relatively effective); *Moynihan v. Saul*, No. 4:19-CV-1396, 2020 WL 5260783, at *5-6 (S.D. Tex. Aug. 6, 2020) (recognizing that a four page narrative discussion which offered a detailed accounting of the Plaintiff's symptoms, treatment, daily activities and abilities, and medical opinion testimony was sufficient).

Liguez testified about his health and its impact on his daily activities. He testified that he sustained back, neck, and left knee injuries from the motor vehicle accident. (Tr. 44-45). He testified that his obesity has caused his pain to increase and that he must ambulate with a cane. He stated that his sleep is interrupted frequently due to pain and having to urinate frequently. He takes several naps during the day. His girlfriend corroborated in a third-party function report that Liguez's condition impacts his mobility and that he is in pain for most of the day. Liguez lives with his girlfriend and her daughter. (Tr. 72). Liguez testified that he has problems standing, lifting, bending, and walking for prolonged periods of time. (Tr. 47, 55). According to Liguez, the pain will start in his lower back and radiate up his neck and to his left knee. (Tr. 62). Liguez estimated that he could stand for 30 minutes, walk a block, and lift and carry approximately 10 to 20 pounds. (Tr. 62, 81-82).

As for his daily activities, Liguez testified that he does some housework and sits in a recliner with his legs elevated to hip level for most of the day. (Tr. 63-64). Liguez testified that he ambulates with a cane. He must use the restroom to urinate approximately every hour. (Tr. 52-53). He testified that he saw a urologist. (Tr. 52). He testified that Dr. Fields prescribed Flomax and

oxybutynin, but neither helped. (Tr. 52-53). With respect to his weight, Liguez testified he weighed 400 pounds and was 5 feet, 11 inches tall. (Tr. 39). Liguez described that his pain on a scale from one to ten was a seven. (Tr. 48). He testified that steroid injections only helped alleviate the pain for a day or two. (Tr. 46). He takes Gabapentin and Tylenol III three times a day for pain. (Tr. 48-51). Liguez stated he has trouble sleeping, even with the use of his CPAP machine, and takes two 30-minutes naps per day. (Tr. 60-61).

Liguez completed a Function Report on April 10, 2019. (Tr. 280-287). Liguez wrote that his injuries have made a substantial impact on his daily routine which limits him from heavy lifting, taking long walks, and household work. (Tr. 280-287). He testified that his girlfriend does the shopping but noted in his report that he accompanies her to the store and leans on the cart while pushing it and can only be there for no more than one hour and only goes once a month. (Tr. 280-287). In Liguez's Function Report dated April 22, 2019, Liguez wrote that he has "extreme pain in [his] back, pain seems to be getting worse" and that there are days that he is in tears and cannot get out of bed or walk. (Tr. 272-278). Liguez complained that his left knee is bothering him more, he cannot bend, and back pain has increased. (Tr. 272-278). Liguez noted that because of the pain, he is not able to keep up with his daily activities such as washing dishes and taking out the trash and has to take more naps because his pain interrupts his sleep. (Tr. 272-278). He testified that he prepares meals in the microwave, mows the lawn, washes clothes, vacuums, and sweeps daily and that his girlfriend cooks, shops, and pays the bills. (Tr. 64-65). Liguez testified that his driving is limited to appointments with his parole officer every three months which takes approximately less than 60 minutes round trip. (Tr. 64-66). He testified that he has difficulty getting dressed, bathing himself, brush his teeth, comb his hair, and feed himself. (Tr. 66-67, 73).

His daily activities include throwing out the trash and helping with the dishes. (Tr. 250). He also walks, drives or rides in a car and goes shopping. (Tr. 251). Additionally, he watches TV, does word puzzles, and spends time with his family and friends. (Tr. 252). Because of his pain, Liguez wrote that he no longer lifts, squats, bends, stands, reaches, walks, sits, kneels, climbs stairs, and has difficulty concentrating and completing tasks. (Tr. 253). He stated that he ambulates with a cane and uses a CPAP device. (Tr. 254). He testified that Dr. Fields issued him a cane because he said he had problems with walking. (Tr. 51). He testified that he uses the cane inside and outside. (Tr. 51-52). He testified that he does not walk anywhere without the cane. (Tr. 52). He stated that the cane is used to walk into the grocery store and then he uses the shopping basket for support. (Tr. 52).

The undersigned finds that there is nothing in the record to suggest that the ALJ made improper credibility findings, or that she weighed the testimony improperly. The ALJ followed the proper legal standards in reaching her determination and adequately articulated her reasoning. Because substantial evidence supports the ALJ's credibility determination, this factor weighs in favor of the ALJ's decision.

### D.  Vocational Testimony

A claimant will be determined to be under disability only if the claimant's physical or mental impairments are of such severity that she is not only unable to do her previous work, but cannot, considering her age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy. 42 U.S.C. § 423(d)(2)(a).

The record shows that Liguez was 52 years old at the time of the administrative hearing, obtained a college degree, and performed past relevant work as a warehouse worker. At step four, the ALJ found that Liguez is unable to perform his past relevant work as a warehouse worker. 20

CFR 416.965. The Commissioner at step five has the burden to show that there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994). An ALJ may properly rely upon the testimony and conclusions of a vocational expert. *Carey v. Apfel*, 230 F.3d 131, 145 (5th Cir. 2000) ("The value of a vocational expert is that he [or she] is familiar with the specific requirements of a particular occupation, including working conditions and the attributes and skills needed.").

The record shows that the ALJ questioned Mallory Hauser, a vocational expert ("VE"), at the hearing. "A vocational expert is called to testify because of [her] familiarity with job requirements and working conditions. 'The value of a vocational expert is that [s]he is familiar with the specific requirements of a particular occupation, including working conditions and the attributes and skills needed.'" *Vaughan v. Shalala*, 58 F.3d 129, 131 (5th Cir. 1995) (quoting *Fields v. Bowen*, 805 F.2d 1168, 1170 (5th Cir. 1986)). It is well settled that a vocational expert's testimony, based on a properly phrased hypothetical question, constitutes substantial evidence. *Bowling v. Shalala*, 36 F.3d 431, 436 (5th Cir. 1994). A hypothetical question is sufficient when it incorporates those impairments that the ALJ has recognized to be supported by the whole record. Beyond the hypothetical question posed by the ALJ, the ALJ must give the claimant the "opportunity to correct deficiencies in the ALJ's hypothetical questions (including additional disabilities not recognized by the ALJ's findings and disabilities recognized but omitted from the question)." *Id.*, 36 F.3d at 436.

The ALJ posed comprehensive hypothetical questions to the VE (Tr. 89-94), and Liguez's counsel questioned the VE (Tr. 94-95). The record shows the following hypothetical questions were posed at the hearing by the ALJ:

Q. All right. And if you assume all of the facts in my previous hypothetical, but you also assume that the individual can frequently reach in all directions, including overhead bilaterally, would that impact the jobs you just identified?

A. No, Judge.

Q. And if the individual were also able to occasionally push, pull, and operate foot controls bilaterally, would that impact those jobs?

A. No, Judge, it would not.

Q. And if the individual were also able to frequently turn their neck 90 degrees or greater to the left, to the right, up or down, would that impact any of these jobs?

A. I mean, it could. But I mean, for most of these jobs, they're generally looking – I don't see a 90 degree – so like the mail clerk position, so I would say, probably not the mail clerk, or the photo copy machine operator, but with the counter clerk, but I suppose it would be more likely, just because they would be switching from phone calls to documents – (Tr. 92).

Liguez contends that the ALJ improperly relied upon vocational testimony to establish the existence of work which he can perform. However, as noted above, the ALJ's RFC determination was not deficient and was properly posed in various hypothetical questions to the vocational expert. The VE characterized the jobs of mail clerk, photocopy machine operator, and ticket seller as light, unskilled jobs, which comports with both the DOT and the ALJ's determination of Liguez's RFC. Concerning limitations in Liguez's ability to reach, the VE testified that her response to the hypothetical questions, specifically those involving reaching limitations, were based on her education and experience, and may vary from those requirements listed in the Dictionary of Occupational Titles (DOT). The Fifth Circuit has recognized that the DOT is not comprehensive, in that it cannot and does not purport to include each and every specific skill or qualification for a particular job. *See Fields v. Bowen*, 805 F.2d 1168 (5th Cir.1986) (relying upon the necessarily general nature of DOT job descriptions to hold that the Dictionary of Occupational Titles is not an

25

adequate substitute for vocational expert testimony or other similar evidence on the issue of whether a claimant can perform other gainful employment). The VE testified that her response to the hypothetical questions, specifically those involving reaching limitations, were based on her education and experience, and may vary from those requirements listed in the Dictionary of Occupational Titles (DOT) (Tr. 95). The ALJ did not err in relying on jobs identified by the VE. Based on the testimony of the vocational expert and the medical records, substantial evidence supports the ALJ's finding that Liguez could perform a reduced range of light work in jobs such as a mail clerk, photocopy machine operator, and ticket seller. (Tr. 23-24, 85-96). The Court concludes that the ALJ's reliance on the vocational testimony was proper, and that the vocational expert's testimony, along with the medical evidence, constitutes substantial evidence to support the ALJ's conclusion that Liguez was not disabled within the meaning of the Act and therefore was not entitled to benefits. Further, it is clear from the record that the proper legal standards were used to evaluate the evidence presented. Accordingly, this factor also weighs in favor of the ALJ's decision.

## VII.    Conclusion

Considering the record as a whole, the undersigned is of the opinion that the ALJ and the Commissioner properly used the guidelines propounded by the Social Security Administration, which direct a finding that Liguez was not disabled within the meaning of the Act, that substantial evidence supports the ALJ's decision, and that the Commissioner's decision should be affirmed. As such, the Magistrate Judge RECOMMENDS that Defendant's Motion for Summary Judgment (Document No. 17) be GRANTED, and that the Commissioner's decision be AFFIRMED.

The Clerk shall file this instrument and provide a copy to all counsel and unrepresented parties of record.  Within 14 days after being served with a copy, any party may file written

objections pursuant to 28 U.S.C. § 636(b)(1)(C), Fed. R. Civ. P. 72(b), and General Order 80-5, S.D. Texas.  Failure to file objections within such period shall bar an aggrieved party from attacking factual findings on appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Ware v. King*, 694 F.2d 89 (5th Cir. 1982) (en banc).  Moreover, absent plain error, failure to file objections within the fourteen-day period bars an aggrieved party from attacking conclusions of law on appeal. *Douglass v. United Serv. Auto Assn,* 79 F.3d 1415, 1429 (5th Cir. 1996).  The original of any written objections shall be filed with the United States District Court Clerk, P.O. Box 61010, Houston, Texas 77208.

Signed at Houston, Texas, this _____ day of _____ August 11, 2021 ____, 2021

_____

FRANCES H. STACY
UNITED STATES MAGISTRATE JUDGE